FILED

2017 MAR 27   PM 4: 04

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY_____

David T. Tran
4396 Formosa St.
Jurupa Valley, CA 92509
(415) 361-9927
trantdavid@gmail.com
No Fax

David T. Tran, In Pro Per

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

David T. Tran,

        Plaintiff,

    v.

Ross University School of Medicine

    Defendant

) CASE NUMBER
)
) ED CV17-00583 AB (PLA)
)
) **COMPLAINT FOR DAMAGES FOR**:
)
) 1) BREACH OF IMPLIED CONTRACT;
) 2) BREACH OF CONTRACT (twice);
) 3) CONTRACT FRAUD;
) 4) MISREPRESENTATION;
) 5) BREACH OF FIDUCIARY DUTIES;
) 6) BREACH OF COVENANT;
) 7) CALIFORNIA'S UNFAIR
)     COMPETITION LAW (in violation of);
) 8) CALIFORNIA EDUCATION CODE
)     § 94814 (in violation of);
) 9) NEGLIGENCE;
) 10) INTENTIONAL/NEGLIGENT
)      INFLICTION OF EMOTIONAL
)      DISTRESS;
) 11) REHABILITATION ACT OF 1973 (as
)      amended) (in violation of);
) 12) TITLE VI, CIVIL RIGHTS ACT OF
)      1964 (in violation of)

## PARTIES, JURISDICTION, and VENUE

1.      David T. Tran (PLAINTIFF) brings suit before the District Court *pro se* and *in forma pauperis*. Suit meets federal diversity jurisdiction, pursuant to 28 U.S.C. § 1332, since PLAINTIFF (currently domiciled in California and at the time the causes of action arose) and ROSS (corporation with a principal place of business in a US state outside of California) are citizens of different states AND the amount in controversy exceeds the minimum threshold of $75,000. Suit also meets federal question jurisdiction, pursuant to 28 U.S.C. § 1331, since some causes of action arise "under the Constitution, laws, or treaties of the United States." Furthermore, suit meets personal jurisdiction over defendant according to "minimum contacts", pursuant to C.C.P. § 410.10, would not "offend traditional notions of fair play and substantial justice" and would not "violate the nonresident defendant's constitutional right to due process" (See *International Shoe Co. v. Washington* (1945)). As a result, supplementary jurisdiction is also met, pursuant to 28 U.S.C. § 1367. Hence, subject matter and personal jurisdictional requirements are met and are explained in ¶ 2-7 below.

2.      The Defendant, Ross University School of Medicine (hereinafter referred to as ROSS), is a private, for-profit medical school with administrative offices in the County of Broward, Florida, at 2300 SW 145th St., Suite 200, Miramar, Florida

30027 and in the County of Middlesex, New Jersey, at 485 US Highway 1 South, Building B 4th Floor, Iselin, New Jersey 08830. ROSS also conducts its Basic Sciences (16 months) portion of the 4-year medical curriculum on the East Caribbean island of Dominica, Lesser Antilles, where the causes of action arose from (but were initiated in California). The medical school dean's office is located at the Florida address. Hence, ROSS has administrative offices in the US and significantly recruits students from regional offices throughout the US, including California. Furthermore, ROSS receives service of process only in the US state of New Jersey even though it is under the jurisdiction of the Commonwealth of Dominica. It is uncertain of ROSS' principal place of business, but it is sure to be either in the US state of New Jersey, Delaware, or Florida (hence, in the US). It is also essential to realize that ROSS "came to PLAINTIFF" and that PLAINTIFF did not "come to them" for recruitment and solicitation purposes. Therefore, ROSS solicited a product (in the form of education) to a Californian (the plaintiff) in California.

3.      California "state court jurisdiction over the person of a defendant is dependent upon three factors: (1) jurisdiction of the state in the constitutional sense; (2) due process in the form of adequate notice and the opportunity for a hearing; and (3) compliance with the state's statutory requirements for the service of

process" (1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 75, p. 600; Li, Cal. Jurisdiction and Process (Cont. Ed. Bar 1970) pp. 16-17.

4. Although it is certain that ROSS' principal place of operations is outside of California, this state (California) has "personal jurisdiction" (*in personam*) over ROSS under the 'minimum contacts' doctrine, pursuant to C.P.P. § 410.10, since ROSS conducts ongoing and substantial business within this state via various recruitment methods, including the use of graduate school information seminars, on-campus graduate school information sessions and booths, advertisements by posting on university billboards, mailing prospective and admitted students catalogs and brochures, electronic communications with students and prospective students from California (including PLAINTIFF), and online advertisements; see *Hall v. LaRonde* (1997) 56 CA4th 1342, 1344. With respect to C.P.P. § 410.10, the section "manifests an intent to exercise the broadest possible jurisdiction. The constitutional perimeters of this jurisdiction are found in the decisions of the United States Supreme Court" (see *Michigan National Bank v. Superior Court*, 23 Cal. App. d3 1 [99 Cal. Rptr. 823]). Relevant to the causes of action, ROSS' affirmative conduct of performing business within California directly led to the recruitment of PLAINTIFF. Substantial communication between both parties occurred while PLAINTIFF was present in and a resident of California (and during recruitment

activities). Hence, it is clear that ROSS also meets the "purposeful availment" prong under 'minimum contacts', attempting to avail itself of forum benefits. Although the 'actual' events constituting the causes of action occurred in a jurisdiction outside of the United States of America, it is immaterial since ROSS meets personal jurisdiction requirements in this state and the 'minimum contacts' is relevant to the causes of action (9) and would promote judicial fair play and substantial justice (see *Luberski, Inc. v. Oleficio F.LLI Amato S.R.L.*, 171 Cal. App. 4th 409, 89 Cal. Rptr. 3d 774 (4th Dist. 2009)). Furthermore, although not related to the causes of action, ROSS has hospital affiliations in the state of California, including Kern Medical Center in Bakersfield, California and California Hospital Medical Center in Los Angeles, California. Also, ROSS conducted an admissions interview with PLAINTIFF at one of its proprietor's (DeVry Education Group) locations in San Diego, California. Hence, although the causes of action arising out of the relationship between PLAINTIFF and ROSS were carried out and performed in the Commonwealth of Dominica, the causes of actions were initiated in Riverside County, California (and where solicitation of ROSS' educational services and recruitment took place). Moreover, a "state has power to exercise judicial jurisdiction over a nonresident individual (or corporation) who does business in the state with respect to causes of action that do not arise from the business done in the state if this business is so continuous and substantial as to make the exercise of such

jurisdiction reasonable … and it is immaterial whether a state has power to prevent a nonresident from doing business within its territory, or to regulate such business, or whether the business involves interstate commerce. The question in each case is whether an individual has a sufficient relationship to the state arising out of such business that makes it reasonable for the state to exercise judicial jurisdiction over the individual as to the particular cause of action" (see C.C.P. § 410.10(7)). The 'minimum contacts' principle also applies to foreign corporations, which includes out-of-state and out-of-country corporations and that due process requires that relationships between a nonresident defendant and the forum state be such that it is fair  and reasonable to require that defendant to submit to suit in the state (see *Cornelison v. Chaney*, 16 Cal. 3d 143, 127 CAL. Rptr. 352, 545 P.2d 264 (1976). Hence, jurisdiction of the state is met in the constitutional sense.


5. Service of process on ROSS will have occurred once proof of service has been filed. Hence, the requirement for due process in the form of adequate notice and the opportunity for a hearing will have been met.


6. Finally,   C.C.P § 416.10 provides for service of process on corporations generally. It makes no distinction between corporations, foreign or domestic, resident or nonresident. [27 Cal. App. 3d 150]. Furthermore, the section reads:

i.   "A summons may be served on a corporation by delivering a copy of the summons and of the complaint; (a) To the person designated as agent for service of process as provided by any provision of Sections 3301 to 3303, inclusive, or Sections 6500 to 6504, inclusive, of the Corporations Code; (b) To the president or other head of the corporation, a vice president, a secretary or assistant secretary, a treasurer or assistant treasurer, a general manager, or a person authorized by the corporation to receive service of process ... "

ii.   Service of process on ROSS will have occurred under subdivision (a) or (b) of C.C.P. § 416.10 once proof of service has been filed.

iii.   Hence, compliance with the state's statutory requirements for the service of process will have been met.

7. Furthermore, suit meets federal question jurisdiction (although it is not necessary since diversity jurisdiction is met as explained above) since there are 2 causes of action that involves the violation of civil rights, namely Title VI of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973 (as amended). Violation of these statutes are primarily responsible for depriving PLAINTIFF of his personal liberties as a citizen of the United States of America. ROSS must

comply with the ADA and civil rights laws since it accepts federal financial assistance from the US Department of Education. Furthermore, the Office for Civil Rights (US Department of Education) explicitly states that a complainant has "the right to file a lawsuit in federal court regardless of the outcome of a case decided on initially by the Office for Civil Rights." This is relevant because PLAINTIFF originally filed a complaint against ROSS with the Office for Civil Rights, which was dismissed as a result of PLAINTIFF being completely naive of the legal system and submitting a complaint under extreme distress, hoping to find a quick solution. Hence, PLAINTIFF files suit due to exhaustion of all previous remedies.

8.   Venue is appropriate since ROSS recruited PLAINTIFF within this district (Riverside County) via a graduate school information booth (where PLAINTIFF spoke to an admissions representative) and advertising fliers at the University of California, Riverside (PLAINTIFF's undergraduate institution), Riverside, California, 92521. PLAINTIFF accepted an admissions offer from ROSS and paid a seat deposit (both via electronic e-mail and payment) in April 2010. Hence, 'minimum contacts' are met pursuant to C.P.P. § 410.10 are met for this state and district even though PLAINTIFF brings forth a case involving diversity jurisdiction. Finally, jurisdiction in California and place of court venue in Riverside County would promote judicial fair play and substantial justice, not only because of

'minimum contacts', but for PLAINTIFF's limited financial resources and the presence of ROSS' extensive legal network (which also represents its parent company, DeVry Education Group and its various subsidiaries) within California. Hence, it would be inappropriate for ROSS to file a motion for *forum non conveniens* since it would not promote fair play and substantial justice. At this time, PLAINTIFF was a resident at 5254 Marlatt St., Mira Loma, CA 91752, Riverside County. PLAINTIFF currently resides at 4396 Formosa St., Jurupa Valley, CA 92509, Riverside County.

9. Suit is deemed timely since "date of injury" did not occur until PLAINTIFF was academically dismissed for the second time in May 2013 and "can be held to be 'injured' only when the accumulated effects ... manifests themselves" (see, *Accord, Urie v. Thompson*, 337 U.S. 163 (1949) (construing "accrual" in the Federal Employers' Liability Act)). Such "date of injury" interpretations was first implemented in a California court case (see, *Associated Indem. Corp. v. Industrial Accident Comm'n*, 124 Cal. App. 378, 12 P.2d 1075 (2d Dist. 1932). In essence, PLAINTIFF would not be inclined to file suit if he was not affected by the cause of actions. Furthermore, PLAINTIFF was not inclined to file suit while on the island of Dominica due to the rigorous nature of the medical curriculum (and the fear of potential biases being in a foreign country, including but not limited to racial

motivation, and the economic growth ROSS brings to its surrounding communities) until he returned to the mainland U.S. in May of 2013. However, the statutes may be tolled up to January of 2014 since a second complaint filed with the US Department of Education's Office for Civil Rights by PLAINTIFF concluded in January of 2014 after his second academic dismissal in May of 2013. Finally, PLAINTIFF initially filed suit against ROSS on September 15, 2016, in the Superior Court of California, Riverside County, which was voluntarily dismissed by PLAINTIFF on September 22, 2016, due to his uncertainty on the actual defendant to sue. PLAINTIFF then filed another suit against DeVry Medical International, Inc., one of ROSS' sister corporations, on September 22, 2016, in the Superior Court of California, Riverside County. This case was removed by DeVry Medical International, Inc., pursuant to 28 U.S.C. § 1441, to the Central District Court of the United States, Eastern Division (Case No. 5.16-cv-02262). This case was voluntarily dismissed by PLAINTIFF on November 1, 2016. On December 1, 2016, PLAINTIFF re-filed suit against ROSS in the Superior Court of California, Riverside County. This case was voluntarily dismissed by PLAINTIFF on February 1, 2017, after in which PLAINTIFF decided to file in federal court on March 27, 2017. All cases dismissed were done so without prejudice. Since the "time" does not accrue during periods of tolling and for 30 days after a case is dismissed (and if later re-filed), pursuant to 28 U.S.C. § 1367(d), accrual only occurred from January

of 2014 through September 15, 2016 (2 years, 7 months), and from March 4, 2017 through March 26, 2017 (23 days). All civil actions brought within 4 years after the date of accrual (or less than 4 years of total accrual) of the cause of actions meeting federal jurisdiction shall be considered timely, pursuant to 28 U.S.C. § 1658.

## **GENERAL BACKGROUND**

10.     PLAINTIFF was medically diagnosed with Obsessive-Compulsive Disorder (OCD) during high school and requires reasonable academic accommodations under 34 C.F.R. § 104.44, in order to minimize the effects his disability on his ability to perform academically.

11.   PLAINTIFF is an "otherwise qualified" individual with a physical or mental impairment that substantially limits one of "major life activities" under Section 504 of the Rehabilitation Act of 1973 (as amended), in particular his difficulties with concentration arising from the nature of his disability (OCD). Furthermore, ROSS is to comply with Section 504 since it is a program that receives federal financial aid funding from the US Department of Education.

12.   A minimum 2.00 GPA is required by the end of the fourth semester of studies in order to advance to clinical studies beginning the fifth semester. If this

"GPA factor" is not met by the conclusion of the fourth semester, the student is subject to academic dismissal.

## STATEMENT OF FACTS AND HISTORY

13.     During his first semester in 2011, PLAINTIFF suffered from disability discrimination, resulting from the inability of ROSS to provide reasonable academic accommodations as required under 34 C.F.R. § 104.44. PLAINTIFF had provided supporting documentation and was entitled to accommodations to minimize the effects his disability had on a "major life activity" as mentioned in § 504, concentration. A very reasonable accommodation would be time extensions on examinations, which was not granted despite PLAINTIFF's request for such time extensions based on his difficulty with concentration during examinations compared to other students.

14.     As result of the occurring violations(s), PLAINTIFF was unable to perform to the best of his abilities given the circumstances since examinations taken during the first semester measured his disability rather than his acquired knowledge. PLAINTIFF was forced to "bubble" in answers as time ran out.  Failing his examinations ultimately led to his academic dismissal in April of 2011 after his

first semester of attendance for "poor academic performance".

15.     PLAINTIFF filed a complaint with the Office for Civil Rights (OCR) during the summer of 2011, alleging disability discrimination for reasons mentioned in ¶ 13-14.

16.     Both parties agreed to undergo an Alternative Dispute Resolution (ADR) and the ECR agreement was reached on October 21, 2011. Later, however, it was realized by PLAINTIFF that the agreement was "lopsided" in several aspects.

17.     PLAINTIFF re-matriculated at ROSS in January of 2012, repeating as a first semester student and was given reasonable academic accommodations.  With the help from such accommodations, PLAINTIFF was able to pass all of his courses. At the end of the semester, however, PLAINTIFF realized that the three "F" grades received in 2011 were actually averaged into the overall GPA. Hence, although passing all of his courses, PLAINTIFF's GPA remained well below the minimum 2.00 required by the end of the fourth semester to advance to the clinical semesters beginning the fifth semester.

18.     During the re-attempt of his first semester, however, it was brought to the

attention of PLAINTIFF that the underlying nature of the ECR agreement was unjust, fraudulent, misrepresented, and oppressive for reasons mentioned below:

a. ROSS failed to disclose to PLAINTIFF during ADR of any grading policy changes that took into effect beginning January of 2012 for incoming matriculants. The change in grading policies would make it much more difficult for PLAINTIFF to progress through the medical school curriculum and attain the minimum overall 2.00 GPA required by the end of the fourth semester. This does not taking into account the 3 "F" grades received in 2011 when PLAINTIFF was not given reasonable academic accommodations, which would be averaged into the overall GPA, thus making it even more difficult to achieve the minimum "GPA factor".

b. A clause within the ECR agreement was formed out of fraud and deceit that negatively affected PLAINTIFF's chances of progressing through the medical curriculum successfully. Furthermore, the interpretation of the clause from PLAINTIFF's perspective was different from that of ROSS'. Hence, in addition

to the presence of fraud in formation of the clause, "meeting of the minds" was absent as well. However, this clause cannot be disclosed as of yet due to the confidentiality clause within the agreement.

19.     Very concerned about the change in grading policies, PLAINTIFF immediately e-mailed the school's academic dean (the Dean), Dr. Joseph Flaherty, regarding the issue. The Dean denied PLAINTIFF's request to get the issue remedied, mentioning that such requests were "without merit". Hence, not only was PLAINTIFF battling with the tougher grading policy changes upon his re-matriculation, there was also the obstacle of overcoming the three "F" grades received in 2011 that were averaged into his overall GPA.

20.     Displeased and distraught over the matter, PLAINTIFF filed another complaint with OCR, alleging disability discrimination. However, the allegations were not considered for evaluation because PLAINTIFF failed to mention how the change in grading policies constituted disability discrimination since OCR only has jurisdiction regarding protected statutes such as race, color, sex, age, and disability.

21.     From May through August of 2012, PLAINTIFF passed all of his

second and third semester courses, although marginally. Marginally passing is still considered "passing" and students have been promoted to the clinical semesters despite marginal or near marginal performance. However, the inability of the Dean to revert the grading policies for PLAINTIFF caused a major distraction. Given the nature of PLAINTIFF's disability and the effect it had on his ability to concentrate, such distractions were only exacerbated. Despite the distractions, PLAINTIFF managed to pass all of his courses by way of being granted time extensions during his examinations and persevering under adverse circumstances. Hence, PLAINTIFF could have performed better academically but for the major distractions than what results actually show on an academic transcript.

22. During his fourth semester (January of 2013 through April of 2013), PLAINTIFF experienced some minor personal issues, but also significant fears of racial or personal discrimination as a result of unfair treatment towards him in one of his courses, thus creating an extremely hostile environment unconducive to learning that proved to be detrimental to PLAINTIFF's psychological and emotional well-being.

23. One of the instructors in the ICM subportion of CCSB, Dr. Worrell Sanford, was thought to have racially discriminated against PLAINTIFF. With the

instructor being a native of Dominica, a country at the time, and still perhaps today, with significant anti-Chinese sentiment, it could easily be construed that there was racism involved, particularly with several stereotypical notions made from the instructor, even though PLAINTIFF is of Vietnamese descent. Such allegations may be seen as speculative although such speculations are supported by strong and reasonable inferences. Despite such speculations, some form of prejudice or discrimination did indeed exist in the form of unfair treatment towards PLAINTIFF and another "Chinese" (east asian) student. Lastly, it was not uncommon for PLAINTIFF to experience blatant racial discrimination while in Dominica for being "Chinese", even from within ROSS and its community.

24.     PLAINTIFF was often inappropriately reprimanded and belittled by Dr. Sanford, whereas other students (despite PLAINTIFF performing to the level similar or better to that of other students within the ICM subportion) were not. As a result, the instructor gave PLAINTIFF 3 "poor" grades, which would automatically constitute failure in the ICM subportion, hence, failure from the entire CCSB course. Such targeted treatment inflicted severe psychological trauma, thus causing PLAINTIFF to miss several class meetings due to fear of further negative treatment from the instructor and his inability to sleep. Furthermore, the "feeling" of being discriminated upon had devastating psychological and emotional consequences as

well.

25.   PLAINTIFF's psychological ill-health brought him to see Ms. Catherine McCarthy, LCSW, one of the clinical counselors at ROSS. Ms. McCarthy described PLAINTIFF as suffering from a "grave" psychological state. She also wrote "letters of excuse" for PLAINTIFF after missing mandatory CCSB activities due to the rapid deterioration in his mental health.

26.   A couple of weeks prior to the final examination, Dr. Lynn Sweeney, one of several CCSB coordinators, arranged a meeting with PLAINTIFF and Ms. McCarthy. At the meeting, Ms. McCarthy reiterated that it was essential that people around PLAINTIFF provided support for him, including ROSS, stemming from the severe psychological adversity PLAINTIFF was experiencing.

27.   With issues in the ICM subportion, one of the clinical directors, Dr. Philip Cooles investigated the issue and determined that there were dilemmas with the "student-instructor" interaction and that PLAINTIFF's three "poor" grades would not count against him. At the same time, the only other east asian student in the class section was also receiving arbitrary "poor" grades, which was determined to not count against him due to issues with the "student-instructor" interaction as

well. Furthermore, PLAINTIFF was allowed to relocate to a different section and instructor for ICM. However, relocation was granted towards the end of the semester when much psychological damage had already occurred. It is also important to note that almost everyone, historically, easily passes the ICM subportion and a student receiving even one "poor" grade is very uncommon.

28.    Concurrently, PLAINTIFF also had the burden of dealing with multiple unexcused absences in CCSB activities due to his psychological and emotional instability stemming from Dr. Sanford's arbitrary behavior. By missing a certain amount of mandatory CCSB activities (aside from the three "poor" grades), PLAINTIFF was at risk of failing the course as well. Hence, one could fail CCSB by either receiving at least three "poor" grades or having at least two unexcused absences.

29.    Concerned, PLAINTIFF emailed the Dean regarding his issue with his former ICM professor, hoping that one of the unexcused absences would be "overlooked" and pardoned so that PLAINTIFF could pass the CCSB course (the three "poor" grades were already pardoned at this point in time by Dr. Philip Cooles). The Dean did not respond until PLAINTIFF sent him a different e-mail depicting a "sobbing" story, hoping that by taking responsibility rather than

*seeming* to make an excuse for academic troubles, the Dean would pardon the unexcused absences. PLAINTIFF was reluctant to further mention issues regarding his interactions with Dr. Sanford and the emotional and psychological ramifications stemming from such interactions due to fear of retaliation and lack of trust in the administration. Hence, accepting responsibility seemed like the only safe route at the time. The Dean actually replied with "I'll try my best, but I can't promise you anything." The Dean never replied thereafter regarding his decision to overlook the unexcused absences.

30.    A week prior to the final examination, some faculty members recommended PLAINTIFF to take a leave-of-absence (LOA), which would allow PLAINTIFF to start anew the following term. Once a student takes the final examination, he or she cannot file for LOA. However, PLAINTIFF was extremely hesitant to file for LOA based on particular circumstances that administration failed to take into account;

   a.  Taking an LOA would be redundant because PLAINTIFF was informed less than a week prior to the final examination that he was already subject to dismissal based on his failure in CCSB as a result of missing a certain number of mandatory activities.

Furthermore, Dr. Matthew Nelson mentions that there was the possibility of PLAINTIFF being dismissed for not meeting the minimum 2.00 "GPA factor". However, Dr. Nelson failed to realize that PLAINTIFF's chances of meeting the criterion was highly unlikely. PLAINTIFF even mentions this to administration, but further advice was not given. Simply put it, PLAINTIFF was forced in such a difficult situation due to ROSS' inability to counsel PLAINTIFF of his academic difficulties (as perceived by ROSS prior to semester 4) and inform him that he was unlikely to advance to the fifth semester since his GPA was too low, making it difficult to attain the minimum 2.00 required by the end of semester 4. PLAINTIFF saw nothing wrong with his academic performance since he continued to pass all of his courses after being given academic accommodations upon his re-admission in 2012.

b. After meeting with a financial aid counselor, ROSS failed to properly counsel PLAINTIFF regarding his question of whether repeating the fourth semester would require him to re-pay tuition

(around $19,000 at the time) and how it would affect his

financial aid status upon re-enrollment.

   c. Furthermore, it was questionable to whether or not the "GPA

factor" would be overlooked even if he were to repeat and pass

all of his courses since nearly perfect grades were required in

order to meet the "GPA factor", a feat that seemed unlikely

based on PLAINTIFF's past academic history. If not, then

PLAINTIFF would inevitably incur more debt upon facing

another academic dismissal. Moreover, it did not make logical

sense that ROSS made it seem like there was a possible benefit if

PLAINTIFF were to take the final examination since ROSS

knew that he had already failed CCSB well in advance of the

final examination and that failure in one course constituted an

impossibility of advancing to the subsequent semester the

following term. The best scenario would be to repeat. However,

PLAINTIFF was still awaiting a reply from the Dean about his

failure in CCSB due to the distressing situation in the course so

that he would not have to repeat the following semester. Two

failures automatically constituted an "subject to dismissal"

status. Unfortunately, however, PLAINTIFF failed one course ("Reproduction and Integumentary") as a result of the final examination, which constituted, at that time, a "subject to dismissal" status for failing that course and CCSB and "Reproduction and Integumentary". At this point, PLAINTIFF was hoping the Dean would overlook the failure in CCSB so that he could repeat the following term rather than having a "subject to dismissal" status.

    d. Deciding on the next course of action given the small time frame to make such pressuring and pivotal decisions considering the unreliability of ROSS' recommendations, PLAINTIFF was very hesitant in filing for LOA due to the disconcerting and discombobulating administrative situation with ROSS.

31.    PLAINTIFF studied for the final examination despite the overwhelming distractions and administrative uncertainties that were eminent at the time. PLAINTIFF took the final examination on March 24, 2013. As a result of the examination, PLAINTIFF failed one of his courses, "Reproduction and Integumentary" (as mentioned in ¶ 30, subpart c), by 2 percentage points.

32.     Following the examination, it was brought to PLAINTIFF's attention that some questions on the examination were accessible to students prior to the examination as recycled questions from leaked study guides. Such questions were not pointed out in class or were not present in any official class files, thus making it unfair for the PLAINTIFF since he did not have access to these questions. This could be significant since outside accessibility could have altered the class curve for the minimum passing score or could have allowed PLAINTIFF to overcome the 2 percentage points (equivalent to one question) if given access to those questions.

33.     At this point (after the final examination), PLAINTIFF had already received two "F" grades, one in CCSB and the other in "Reproduction and Integumentary".

34.     As stated in OCR's determination of a complaint later filed in 2013 (after Plaintiff's second academic dismissal), the Dean mentions that it would have been "mathematically impossible" for PLAINTIFF to attain the minimum 2.00 GPA even if he repeated the fourth semester in order to advance to clinical studies. Hence, the "GPA factor" was crucial in determining if PLAINTIFF was to be promoted to the clinical semesters or not, and that his situation was no exception to

the rule. Furthermore, Dr. Nelson also mentions the "GPA factor" in an e-mail dated on March 14, 2013.

35.    Accordingly, the Student Handbook (the Handbook) mentions that "At appropriate points in the educational process, the faculty reviews the progress of each student in order to identify any academic difficulties that may exist or are developing." This is relevant because ROSS failed to counsel PLAINTIFF of any potential academic issues even though he was in jeopardy of another academic dismissal even if PLAINTIFF were to pass all of his fourth semester courses since his overall GPA was still well under 2.00 (because ROSS egregiously factored the three "F" grades received in 2011 when PLAINTIFF was not given reasonable accommodations into his overall GPA) despite successfully progressing to subsequent semesters upon his re-admission.

36.    Since PLAINTIFF was a marginal to average student (on record) at best after re-matriculating in 2012, the administration was obligated to notify him of his academic situation because nearly "straight A" grades were required of PLAINTIFF during the fourth semester  to reach the minimum 2.00 GPA required to advance to the fifth semester.  It was assumed by PLAINTIFF that, by passing all of his courses after re-matriculation while given reasonable academic

accommodations and that administration had not yet warned him of any academic troubles, he was performing satisfactorily.

37.     The inability of ROSS to counsel PLAINTIFF of his academic situation, taking into account the "GPA factor", meant that PLAINTIFF incurred unnecessary time as an enrolled student, money spent, and the stress of being a medical student. Essentially, ROSS' conduct led to PLAINTIFF's detriment, particularly from events during his fourth semester of attendance that would prove to have long-term psychological and emotional consequences.

38.     Furthermore, it was questionable to the actual grounds leading to PLAINTIFF's status of "subject to dismissal". Since ROSS factored in the three "F" grades received in 2011 (into his overall GPA) when PLAINTIFF was not given reasonable academic accommodations, it was easily and reasonably assumed that the failed courses then culminated as one offence. Two offences constitutes an academic dismissal according to the Handbook. Hence, PLAINTIFF was under the reasonable impression that anymore offences, including one more "F" grade, was grounds for a "subject to dismissal" status.

39.     This assumption was somewhat affirmed when PLAINTIFF was notified that he had failed CCSB a week prior to the final examination, while awaiting a reply from the Dean, hoping that he would pardon the unexcused absences, similar to Dr. Cooles dismissing the "poor" grades due to "extenuating circumstances" and the misfortunate situation with Dr. Sanford. Although PLAINTIFF assumed that he had already committed his second offence, it was urged and recommended by faculty members that PLAINTIFF file for LOA. However, it would be redundant to file for LOA since PLAINTIFF had already committed his second offence and would be "subject to dismissal" regardless. Hence, this was one of the reasons PLAINTIFF was also hesitant in filing for LOA due to high uncertainty and the inability of ROSS to provide proper and sound guidance, particularly during a time when PLAINTIFF was experiencing immense psychological and emotional distress, and incapable of making rational decisions in his best interests.


40.     Accordingly, it remains uncertain (due to the ambiguity of the ECR agreement) to what actually triggered the "subject to dismissal" status because it was later implied that PLAINTIFF's failure in CCSB was his first offence and the "F" grade received as result of the final examination ("Reproduction and Integumentary"). If this were the case, it would have made PLAINTIFF's decision

to file for an LOA a lot easier since the second offence would have been avoided by not sitting for the final examination. This could be the reason why it was recommended to take the LOA. However, filing for LOA would mean PLAINTIFF still must attain nearly "straight A" grades upon his return in repeat of his fourth semester, a feat that seemed highly unlikely based on prior semester performances, in order to reach the minimum 2.00 GPA requirement to advance to clinical studies beginning the fifth semester. Hence, ROSS did not counsel PLAINTIFF when they were obligated to do so, particularly in reference to the 2.00 "GPA factor" in prior semesters and that a major improvement was required.

41.     Regardless of the ambiguous nature of PLAINTIFF's "subject to dismissal" status, ROSS is liable for creating a *hostile* learning environment, evidenced by PLAINTIFF's interactions with his ICM instructor and the inability of the Dean to justly revert the grading policies (when it was intentionally or negligently concealed to his awareness during ADR that new grading policies were to take effect upon his readmission), thus giving rise to overwhelming distractions his entire time as a student, thus negatively exacerbating his substantially limited "major life activity" of concentration. In essence, PLAINTIFF was never able to solely focus on his studies his entire duration at ROSS, even in 2011 when he was distraught and extremely distracted over the fact that he was not receiving adequate

and reasonable academic accommodations. Hence, PLAINTIFF did not "fairly" fail any semesters on his own merits, neither in 2011 or 2013. PLAINTIFF was never given a fair opportunity to succeed in medical school.

42.     By implementing a new grading policy without notifying the PLAINTIFF upon his readmittance, the effects of arbitrary behavior, discrimination, and the inability of ROSS to abide by its own written rules to provide proper guidance and to mention any perceived academic deficiencies, and the unjust nature of the contents and in formation of the ECR agreement, PLAINTIFF's dismissal is not genuinely an academic decision.  Furthermore, the decisions leading up to the dismissal were egregious, oppressive, arbitrary and capricious, and shows a lack of regard for persons with disabilities and students in general. Furthermore, such conduct illustrates the "for-profit" mindset of ROSS. Such conduct from ROSS eventually led to PLAINTIFF's detriment as exemplified by his unjust academic dismissal.

43.     After being dismissed again in April 2013, PLAINTIFF underwent internal grievance procedures with ROSS, but the dismissal was upheld. Without success, PLAINTIFF filed another complaint during that summer with OCR, alleging disability discrimination and retaliatory acts committed by ROSS.

44.     The case went to mediation again, but an agreement could not be reached this time. As a result, the case went to investigation. Not being legally versed, lacking a strong understanding of the legal system, and facing a distressing situation, PLAINTIFF presented incoherent claims, particularly claims not supporting disability discrimination. Consequently, the allegations were dismissed along with the case and PLAINTIFF had exhausted his legal options with OCR by January 2014.

45.     After the conclusion of the case filed with OCR, PLAINTIFF underwent a lengthy period of depression. He was diagnosed, in addition to his pre-existing diagnosis of Obsessive-Compulsive Disorder (OCD), with Recurrent Major Depression by his psychiatrist, Dr. Mandeep Reddy, M.D. on March 5, 2014.

46.     PLAINTIFF has suffered an immense amount of emotional distress, pain and suffering,  and psychological damage resulting from the oppressive conduct of ROSS.

47.     PLAINTIFF continues to have daily feelings of doubt, shame, embarrassment, and insecurity.

48.     The relationship between PLAINTIFF and his spouse has been a very negative one. Heated arguments take place nearly daily due to the PLAINTIFF's frustration and the greater expectations the spouse has of him. There have been periods of short separation between the couple. It has come to a point, in which both are only together "for the kids". Also, PLAINTIFF has been unable to be sexually intimate with his spouse as often as before.

49.     The plan while PLAINTIFF was in medical school was for his spouse to quit her job in order to take care of the children and raise them. However, the incident with ROSS required his spouse to look for a new job and to work full-time to financially support the family since PLAINTIFF was unable to find work, particularly with his emotional and psychological ill-health and inability to cope with his dismissal at ROSS. Furthermore, the situation became so horrendous at one point that PLAINTIFF was homeless for a week as a result of his depression and did not want his children to see what their father had become. Hence, such events depicts the psychological and emotional and financial burden ROSS inflicted on PLAINTIFF and his family.

50.     Aside from the struggles with his spouse, PLAINTIFF became uncharacteristically and noticeably abusive towards his children. He became easily annoyed and irritable with everything that went on. Furthermore, his eldest child continued to question her parents' love for her as a result of the continuous arguing within the household and the lack of affection between the couple. Being a father of young children, PLAINTIFF did not have the chance to enjoy these precious and memorable years due to his depression, anger, and sense of insecurity.

51.     PLAINTIFF has also suffered humiliation and shame from within his family, relatives, and spouse's relatives. Hence, his reputation has been tarnished and his livelihood taken away. For example, he would seldom attend family get-to-togethers such as barbeques and birthday parties due to fear of rejection, ridicule, and judgment. In several instances, his spouse's relatives questioned why she would still be involved with such a "loser". His spouse's father, a person PLAINTIFF sees daily, would often call him a "deadbeat" and mutter words in Spanish to neighbors. Also, PLAINTIFF's parents would not know what to say when asked of their child's life situation. Such feelings of shame and humiliation has affected PLAINTIFF's emotional and psychological well-being as well as his relationships with the people who matter the most in his life.

52.     To this day, PLAINTIFF remains in a state of "limbo". He continues to experience extreme psychological and emotional distress and suffers relapses with OCD, and daily with his most recent diagnosis, Major Depression. He also has student loans totalling close to $140,000 and  has been scripped of his personal liberty, self-esteem, reputation, and livelihood. Most importantly, PLAINTIFF has been unfairly denied the opportunity to become a physician, a dream he has worked very hard to attain throughout his entire life.

STATEMENT OF CLAIMS


**FIRST CAUSE OF ACTION**

(Breach of implied contract v. Defendant)

53.     PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-52.


54.     The 'student-institutional' relationship is an implied contract between PLAINTIFF and ROSS upon PLAINTIFF's enrollment and payment of tuition and fees.


55.     ROSS had an obligation to provide an educational environment conducive to learning, free from any form of harassment and discrimination. See

Tedeschi v. Wagner College, 93 Misc. 2d 510, 402 N.Y.S.2d 967 (1978) aff'd, 70 App. Div.2d 934, 417 N.Y.S.2d 521 (1979).

56.     ROSS breached this implied contract due to Dr. Worrell Sanford's conduct towards PLAINTIFF, a major factor in causing PLAINTIFF's subsequent psychological and emotional detriment. Furthermore, ROSS failed to take into account and address Dr. Sanford's conduct towards PLAINTIFF and how this affected PLAINTIFF's academic performance.

57.     For the foregoing reasons, PLAINTIFF is entitled to remedies stemming from the breach of implied contract and the ramifications resulting from such a breach, namely consequential damages such as income he would possibly receive from the six or seven years of life lost as an aspiring psychiatrist in San Francisco, CA, and direct damages, such as an injunction, concomitantly, for him to re-enroll as a fourth semester student at ROSS or any comparably accredited medical school. If this is not possible, then PLAINTIFF is instead entitled to a lifetime's psychiatrist salary in San Francisco, CA, as deemed appropriate upon final calculation of damages. There is precedent of an unfairly dismissed medical student winning a case and collected for lost past and future income. See *Sharick v. Southeastern University of Health Sciences*. Finally, PLAINTIFF is also entitled to

special damages resulting from the hostile learning environment, unjust academic dismissals, and subsequent psychological trauma inflicted upon by ROSS.

## SECOND CAUSE OF ACTION

*(Breach of Contract v. Defendant)*

58.     PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-57.

59.     The Student Handbook represents a binding contract. There is no dispute that this contract existed.

60.     ROSS breached this contract when it was to "at particular points in the educational process... identify any academic difficulties that may or are developing," particularly when it was unreasonable to expect PLAINTIFF to achieve nearly "straight A" grades during his fourth semester to attain the minimum 2.00 GPA to advance to the fifth semester. Notwithstanding the "GPA factor", ROSS still was obligated to identify PLAINTIFF as a risk to a "subject to dismissal" status and counsel him as required by the Student Handbook so that he would be cognizant of ROSS' intentions of dismissing him if his performance did

not improve substantially. PLAINTIFF read and took into account this section of the Handbook during his stint at ROSS.

61.     As a result of this breach, PLAINTIFF spent unnecessary time as an enrolled student, unnecessary money on tuition, and underwent the unnecessary stress that comes with being a medical student as a result of his dismissal at the conclusion of the fourth semester.

62.     Accordingly, PLAINTIFF unnecessarily enrolled in the fourth semester where he experienced grave psychological difficulties arising from the conduct of ROSS, leading to long-term psychological and emotional trauma thereafter. In essence, PLAINTIFF would have been "better off" if ROSS would have dismissed him during earlier semesters (despite the issues regarding change of the grading system without PLAINTIFF's knowledge)  so that he would not have undergone the issues that were present during his fourth semester. This ultimately led to the arbitrary and capricious dismissal of PLAINTIFF at the conclusion of the fourth semester.

63.     As a legal result of the foregoing, PLAINTIFF was dismissed from ROSS and underwent "grave" psychological trauma during Semester 4 and upon

his return to the United States of America after his dismissal in 2013. Furthermore,

PLAINTIFF continues to endure psychological ill-health and undue hardship

stemming from the unlawful acts of ROSS. Hence, PLAINTIFF is entitled to

damages (and a possible injunction) as mentioned in ¶ 57.


### THIRD CAUSE OF ACTION

*(Breach of Contract v. Defendant)*

64.    PLAINTIFF re-alleges and incorporates by reference allegations

contained in ¶ 1-63.


65.    A clause within the ECR agreement was breached. Due to the breach it

is necessary to disclose the agreement despite a confidentiality clause within the

agreement.


66.    As a result of the breach, PLAINTIFF suffered injuries and is entitled

to damages (and a possible injunction) as mentioned in ¶ 57.


### FOURTH CAUSE OF ACTION

*(Contract Fraud v. Defendant)*

67.    PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-66.

68.    ROSS deceived PLAINTIFF during ADR in 2011, leading to a very unconscionable clause within the ECR agreement. A fraudulent representation was made, in which ROSS knew to be untrue and was made for PLAINTIFF to rely on such information, PLAINTIFF relied on this information during mediation, thus leading to the adverse academic situation and subsequent academic dismissal of PLAINTIFF. However, the agreement is confidential and cannot be disclosed as of yet.

69.    As a result of such deception, PLAINTIFF suffered injuries and is entitled to the "benefit of the bargain". Furthermore, such deception contributed to PLAINTIFF's academic dismissal and subsequent psychological and emotional trauma, which still persists today. Hence, PLAINTIFF is entitled to damages (and a possible injunction) as mentioned in ¶ 57.

**FIFTH CAUSE OF ACTION**

(Misrepresentation v. Defendant)

70.     PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-69.

71.     ROSS failed to inform PLAINTIFF of any grading policy changes that would directly affect him. Such information was obviously unknown to PLAINTIFF and it was unlikely that PLAINTIFF would discover or inquire about such information.

72.     As a result of nondisclosure and the subsequent effects such an "unfair surprise" had on the chances of PLAINTIFF of progressing through the medical curriculum, PLAINTIFF was unjustly dismissed from ROSS and is entitled to the "benefit of the bargain". Moreover, he is entitled to damages (including a possible injunction) as mentioned in ¶ 57.

## SIXTH CAUSE OF ACTION

(Breach of Fiduciary Duty v. Defendant)

73.     PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-72.

74.    Although it is known historically that there is no fiduciary relationship between that of an educational institution and its students, the norm is set aside when the magnitude of the student-institution or student-instructor relationship is "more than a typical one". Accordingly, ROSS had a fiduciary duty to PLAINTIFF to act with the utmost good faith and in his best interests, reaffirmed by the presence of a rather personal relationship a medical school has with its individual students, the uncomparable and intimate trust to that of other professions and undergraduate institutions, advice given to students including PLAINTIFF, and the ECR agreement. Furthermore, the purpose of the ECR agreement was not to allow ROSS "off the hook" and continue its course of oppressive and arbitrary conduct, but for them to protect to a reasonable extent the interests of PLAINTIFF and to behave non-arbitrarily and professionally.

75.    In the context of the medical school setting where professionalism is highly expected and valued, PLAINTIFF heavily relied on his instructors and professors as mentors who would instill and provide him the knowledge to become a successful practitioner, while maintaining high ethical standards and an education free from a "hostile" learning environment, arbitrary conduct and discrimination. ROSS was well aware of PLAINTIFF's vulnerability as a student with a disability, his long-standing history with ROSS, including concerns regarding unfair grading

policies, the deceptive and seemingly unconscionable nature of the ECR agreement, and the unfortunate situation arising during his fourth semester. To this account, it is evident that ROSS failed to exercise to the level of care expected of educators and educational administrators in this context.

76.     Lacking regard of one's personal liberties, reputation, and livelihood, ROSS acted oppressively, egregiously, and arbitrarily in breach of duties as educational and educational administrative providers. Hence, ROSS did not live up to its educational mission as "One School, One Team".

77.     As a legal result, PLAINTIFF was injured and entitled to consequential and special damages (and a possible injunction) arising out of the fiduciary breach. FURTHERMORE, PLAINTIFF is entitled to punitive damages as permitted under C.P.P. § 3294, as a result of ROSS' oppressive and arbitrary conduct.

## **SEVENTH CAUSE OF ACTION**

(Breach in Covenant v. Defendant)

78.     PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-77.

79.     By enrolling at ROSS, there is an implied student-institutional relationship that must be met with the utmost good faith in performance of duties from both parties. Arbitrary and oppressive action on behalf of ROSS deprived PLAINTIFF to reap the benefits of an education as a consumer of education. Furthermore, the ECR agreement also renders a contractual obligation in which both sides are to act in good faith, even during formation of the agreement since notions of good faith and fair dealing mandates disclosure, which lies, in part, in fraud, deceit, and misrepresentation.

80.     Despite the presence of these contracts, ROSS acted in bad faith even after PLAINTIFF expressed his concerns regarding the ECR agreement to ROSS. Furthermore, any reasonable person would view the agreement as unconscionable or disproportionate, thus establishing a bad faith motive due to ROSS' inability to reasonably and justifiably remedy PLAINTIFF's concerns. Notwithstanding the agreement, the implied contract (student-institutional relationship) requires that ROSS carry out its obligated duties with the utmost reasonable care.

81.     As a legal result of the breach of fiduciary duties, PLAINTIFF is entitled to damages (and a possible injunction) as mentioned in ¶ 57.

## EIGHTH CAUSE OF ACTION

(in violation of California's Unfair Competition Law v. Defendant)

82.     PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-81.

83.     For reasons set forth in Paragraphs 1 through 79, ROSS' business conduct satisfies at least one of the three prongs (unfair, unlawful, fraudulent business acts or practices) in order to establish a UCL claim. See Prof. Bus. Code § 17200 et seq. The purpose of the UCL is to 'protect both the consumers and competitors by promoting fair competition in commercial markets for goods and services'. Accordingly, ROSS acted arbitrarily towards PLAINTIFF throughout his stint at the School of Medicine, including issues pertaining to the formation and implementation of the ECR agreement, the student-institutional relationship, and his dismissal, which cannot be seen as a genuinely academic decision.

84.     Furthermore, the contents or nature of the ECR agreement is similar to an advertisement, in which PLAINTIFF relied on the proposed clauses or omitted information on behalf of ROSS in deciding to prolong mediation, accept the agreement as is and re-enroll at ROSS, or continue with investigation during the OCR complaint process. PLAINTIFF even expressed concerns regarding the

inequitable situation he was succumbed to and ROSS' refusal to remedy the issue can be seen as extremely unjust to any reasonable person. Hence, PLAINTIFF also incorporates a violation of Prof. Bus. Code § 17500 et seq. (as part of the UCL claim), false and/or misleading advertising or representation.

85.     As a legal result, PLAINTIFF suffered injury 'in fact' and has incurred monetary losses from tuition payments, miscellaneous expenses, including but not limited to cost of airline tickets, and future and past income lost, as a result of 'unfair' competition and getting the "lower end of the bargain" as it pertains to the student-institutional relationship and the ECR agreement due to bad faith bargaining. Hence, PLAINTIFF has standing for a UCL claim and is entitled to damages (and a possible injunction) as mentioned in ¶ 57.

## **NINTH CAUSE OF ACTION**

(in violation of California Education Code § 94814 v. Defendant)

86.     PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-82.

87.     PLAINTIFF has standing to bring forth violation(s) in Calif. Edu. Code § 94814 as a private right of action. See *Daghlian v. DeVry University, Inc.*

88.     Section 92814(a) makes it mandatory for post-secondary institutions to "provide to students and other interested persons, prior to enrollment, a catalog[ue] or brochure containing... all... material facts concerning the institution and the program or course of instruction that are reasonably likely to affect the decision of the student to enroll..." Failure to disclose information renders a written contract unenforceable under Calif. Educational Code § 94814(b).

90.     Even though the formation of the ECR agreement  occurred after PLAINTIFF's initial enrollment at ROSS in 2011, the formation of the ECR agreement can be seen as a pre-enrollment or recruiting matter since PLAINTIFF was seeking readmission. ROSS' failure to inform PLAINTIFF of grading policy changes prior to his re-matriculation in 2012 (in addition to fraud during the ECR agreement) is in violation of § 94814 because such omissions and fraudulent representations would have otherwise affected PLAINTIFF's decision to re-enroll, prolong mediation, or proceed with investigation during the OCR complaint process. Even after PLAINTIFF expressed the unfair situation he faced upon re-matriculation, ROSS failed and was unwilling to rectify the issue, a situation which can be seen as unjust to any reasonable person.

91.     As a legal result of the foregoing, PLAINTIFF suffered injury 'in fact' and is entitled to damages (and a possible injunction) as mentioned in ¶ 57.

## **TENTH CAUSE OF ACTION**

(Negligence v. Defendant)

92.     PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-91.

93.     Due to irrational, oppressive, arbitrary, and negligent conduct on behalf of ROSS, PLAINTIFF suffered severe emotional and psychological injuries. Furthermore, ROSS has unfairly "destroyed and played with the career" of PLAINTIFF and caused the loss of consortium between PLAINTIFF and his family, in particular with his significant other.

94.     ROSS owed a duty to PLAINTIFF to act according with educational and administrative matters absent of arbitrary, oppressive, unfair (even if strict) conduct. ROSS failed this duty as an educational institution of higher learning.

95.     Evidently, ROSS' actions were an actual and proximate cause of

PLAINTIFF's injuries. Hence, PLAINTIFF is entitled to damages (and a possible

injunction) as mentioned in ¶ 57.


## ELEVENTH CAUSE OF ACTION

(intentional or negligent infliction of emotional distress v. Defendant)

96.     PLAINTIFF re-alleges and incorporates by reference allegations

contained in ¶ 1-95.


97.     ROSS' conduct towards PLAINTIFF, including but not limited to the

capricious and arbitrary academic dismissals of PLAINTIFF and matters pertaining

to and leading up to the formation of the ECR agreement, showed extreme

recklessness and disregard for the goodwill of PLAINTIFF. Moreover, such

conduct was outrageous and oppressive (destroying one's career aspirations,

emotional and psychological well-being, and at the same time putting PLAINTIFF

under enormous financial debt and caused loss of consortium).


98.     Such reckless and outrageous conduct is the cause of PLAINTIFF's

emotional distress and is well-documented by PLAINTIFF's psychiatrist.

99.     As a legal result, PLAINTIFF suffered immense mental distress and is entitled to damages arising from emotional distress as permitted by law.

### TWELFTH CAUSE OF ACTION

(in violation of ADA v. Defendant)

100.    PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-99.

101.    Since ROSS defrauded and misrepresented information during and leading up to the ECR agreement, the agreement shall be deemed void. Hence, ROSS shall not be "free" from any wrongdoing prior to the agreement.

102.    In January of 2011, ROSS failed to provide PLAINTIFF with reasonable academic accommodations. Even though ROSS did not admit fault, it is evident that ROSS was liable for violating federal law requiring that educational institutions receiving federal financial assistance provide "qualified" individuals with a disability reasonable accommodations. Hence, PLAINTIFF wishes to pursue this cause of action in federal court since the complaint filed in 2011 cannot be reopened.

103.   As a legal result, PLAINTIFF seeks an injunction for the creation of a new or revised agreement and/or damages resulting from violation of the ADA.

## THIRTEENTH CAUSE OF ACTION

(in violation of Title VI of the Civil Rights Act of 1964 v. Defendant)

104.   PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-103.

105.   ROSS receives US federal funding from the US Department of Education, and hence, is not exempt from federal anti-discrimination laws, including but not limited to Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination (42 U.S.C. § 2000(d)). Furthermore, the US Supreme Court has determined that individuals have a private right of action for a claim under Title VI. In this case, PLAINTIFF was subject to racial discrimination in his CCSB course.

106.   PLAINTIFF is a member of a "protected" racial group. PLAINTIFF was treated differently than similarly situated members of other racial groups with regard to a service, benefit, privilege, participation, etc. In this case, PLAINTIFF was denied the opportunity to participate under "fair" conditions as it pertains to

PLAINTIFF being harassed and graded unfairly due to his national origin (See 34 C.F.R. § 100.3(b)(1)(vi)). Discrimination was so severe, pervasive, and objectively offensive that it effectively barred PLAINTIFF access to an educational opportunity or benefit. PLAINTIFF was also denied the privileges enjoyed by others through participation (See 34 C.F.R. § 100.3(b)(1)(iv)).

107.   Furthermore, there is no legitimate or non-discriminatory reasons behind the discriminatory actions of PLAINTIFF's CCSB instructor, Dr. Worrell Sanford toward PLAINTIFF himself.

108.   As a legal result, PLAINTIFF is entitled to damages (and a possible injunction) as mentioned in ¶ 57.

## DISCUSSION FOR "PRAYER" FOR RELIEF

109.   It is also appropriate to claim for consequential damages for lost of future and past income (See *Sharick v. Southeastern University of Health Sciences, Inc.*) based on the "economic loss rule" (i.e. breach of implied contract) and tort liability (i.e. breach of fiduciary duty).